Case 1:24-mj-00081-RMM Doc

Case: 1:24-mj-00081
Assigned To : Judge Robin M. Meriweather
Assign. Date : 3/1/2024
Description: COMPLAINT W/ARREST WARRANT

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>**RUBY CORADO**<br>(a/k/a "Ruby Jade Corado" and<br>"Vladamir Orlando Artiga Corado")<br><br>**Defendant.** | **UNDER SEAL**<br><br>**VIOLATIONS:**<br><br>18 U.S.C. § 1344 (Bank Fraud)<br><br>18 U.S.C. § 1343 (Wire Fraud)<br><br>18 U.S.C. § 1956 (Laundering of Monetary Instruments)<br><br>18 U.S.C. § 1957 (Monetary Transactions in Criminally-Derived Proceeds)<br><br>31 U.S.C. §§ 5314 and 5322(b) (Failure to File Report of Foreign Bank Account) |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL
## COMPLAINT AND ARREST WARRANT

I, Paulina Murphy, being first duly sworn, hereby depose and states as follows:

1. This Affidavit is submitted in support of a Criminal Complaint charging RUBY CORADO (also known as "Ruby Jade Corado" and "Vladamir Orlando Artiga Corado") with violations of 18 U.S.C. §§ 1344 (Bank Fraud), 1343 (Wire Fraud), 1956 (Laundering of Monetary Instruments), and 1957 (Monetary Transactions in Criminally-Derived Proceeds); and 31 U.S.C. §§ 5314 and 5322(b) (Failure to File Report of Foreign Bank Account). As described further below, there is probable cause to believe that CORADO, former Executive Director of a non-profit organization named Casa Ruby, fraudulently obtained funds from government-supported loan

programs and diverted those funds to her bank account(s) located outside of the United States. And CORADO, who is a lawful permanent resident of the United States, has never reported her foreign bank account(s) to the Department of the Treasury, Internal Revenue Service, as required by law.

2. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since April 10, 2022, and am currently assigned to the Washington Field Office to a squad that investigates public corruption, violations of civil rights, and fraud against the government in the District of Columbia. My primary responsibilities include conducting and assisting with investigations involving public corruption, fraud, civil rights, and other related violations of federal criminal law. I have participated in the execution of numerous search warrants conducted by the FBI and in the seizure of various types of digital evidence. Prior to my service with the FBI, I was a Licensed Professional Counselor.

3. During my training at the FBI Academy, Quantico, Virginia, I have received training in a variety of investigative and legal matters, including physical surveillance, legal statutes and procedures, financial investigations, confidential source management, Fourth Amendment searches, the drafting of search warrant affidavits, probable cause, and digital forensic data analysis.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. Because this Affidavit is submitted for the limited purpose of establishing probable cause to support an application for an arrest warrant, it does not contain every fact known by me or the United States. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements. All times provided in this affidavit should be read as "on or about" times and are given in Eastern Standard Time unless otherwise noted.

## BACKGROUND

*The Paycheck Protection Program*

5.  The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of billions of dollars in forgivable loans to small businesses for job retention and certain other expenses, through a loan program referred to as the Paycheck Protection Program ("PPP").

6.  In order to obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business. The applicant of a PPP loan was required to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the applicant had to state, among other things, its: (a) average monthly payroll expenses and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses. To qualify for eligibility, businesses applying for a PPP loan needed to be in operation as of February 15, 2020. Applicants were required to electronically certify that the information provided was accurate and were warned that any false statement or misrepresentation to the SBA on the loan application or any misapplication of loan proceeds could result in sanctions, including criminal penalties.

7.  A PPP loan application was required to be processed by a participating financial institution (each a "lender"). If a PPP loan application was approved, then the lender funded the PPP loan using its own monies, which were 100% guaranteed by the Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of

the loan, and the listed number of employees, were transmitted by the lender to the SBA in the course of processing the loan.

8. PPP loan proceeds were required to be used by the receiving business for certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP program allowed the interest and principal on a PPP loan to be entirely forgiven if the receiving business spent the loan proceeds on permissible expenses within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

9. In or around December 27, 2020, the Economic Aid to Hard-Hit Small Business, Nonprofits and Venues Act (the "Economic Aid Act") provided additional funding for the PPP and extended the application deadline to March 31, 2021. The Economic Aid Act enabled borrowers to take a second draw PPP loan under the same general terms as their first PPP loan, up to a maximum loan amount of $2 million. The Economic Aid Act reopened the PPP loan program to borrowers who did not previously receive a first draw PPP loan. To be eligible for a second draw, a borrower had to employ no more than 300 employees, demonstrate a 25% reduction in gross receipts during a calendar quarter in 2020, and have expended the full amount of its initial PPP loan. Allowable expenses were expanded to include worker protection costs related to COVID-19, uninsured property damage costs caused by looting or vandalism during 2020, and certain supplier costs and expenses for operations. The expansion applied retroactively to first draw PPP loans not forgiven by the SBA.

10. On or around March 25, 2021, the PPP Extension Act of 2021 extended the application deadline from March 31, 2021, to May 31, 2021. In addition to extending the PPP application filing window by 60 days, the Extension Act provided an extra 30 days for the SBA to finish processing applications received by the May 31, 2021, deadline.

*The Economic Injury Disaster Loan Program*

11. An Economic Injury Disaster Loan ("EIDL") is an SBA-administered loan designed to provide assistance to small businesses that suffer substantial economic injury as a result of a declared disaster. An EIDL helps businesses meet necessary financial obligations that could have been met had the disaster not occurred. It provides relief from economic injury that the disaster caused and permits businesses to maintain a reasonable working capital position during the period that the disaster affected. Additionally, the SBA offers an EIDL advance designed to provide emergency economic relief to businesses experiencing a temporary loss of revenue. This advance does not have to be repaid and small businesses can receive an advance even if they are not approved for an EIDL.

12. In March 2020, due to the COVID-19 pandemic, the SBA issued an Economic Injury Disaster Loan declaration. The declaration made EIDLs available nationwide to small businesses to help alleviate economic injury that COVID-19 caused. EIDLs were usually limited to a maximum amount of $2 million. However, during the COVID-19 pandemic, EIDLs were limited, for a period of time, to $150,000.00. The amount of the loan and the amount of the advance were determined by the SBA based on information provided in the loan application.

13. During the COVID-19 pandemic, EIDL funds were issued directly from the United States Treasury and applicants applied through the SBA via an online portal. The EIDL application process, which also used certain outside contractors for system support, collected information concerning the business and the business owner, including information as to the gross revenues for the 12 months prior to the disaster; the cost of goods sold; and information as to any criminal history of the business owner. Applicants were required to electronically certify that the information provided was accurate and were warned that any false statement or misrepresentation to the SBA on

the application or any misapplication of loan proceeds could result in sanctions, including criminal penalties.

*Offshore Banking by U.S. Persons*

14. The Internal Revenue Service (the "IRS") is an agency of the United States Department of the Treasury responsible for administering and enforcing the tax laws of the United States and collecting the taxes owed to the Treasury of the United States by its citizens.

15. United States citizens and residents have an obligation to report to the IRS on Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether that individual had a financial interest in, or signature authority over, a financial account in a foreign country during a particular year by checking "Yes" or "No" in the appropriate box and identifying the country where the account was maintained. United States citizens and residents also had an obligation to report all income earned from foreign financial accounts on their tax returns.

16. United States citizens and residents who had a financial interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a calendar year were required to file with the Department of the Treasury for that calendar year a Report of Foreign Bank and Financial Accounts on Form TD F 90-22.1 ("FBAR").

**PROBABLE CAUSE**

17. Casa Ruby, Inc., was a District of Columbia nonprofit organization incorporated to serve a critical need in the District of Columbia (the "District")—providing transitional housing and related support to youth who identify as lesbian, gay, bisexual, transgender, queer and other sexual identities and orientations ("LGBTQ+"). Casa Ruby, Inc., was funded through charitable donations from the public and grants from the District government. CORADO was the founder of

Casa Ruby, and Casa Ruby's namesake. CORADO's name at birth was "Vladamir Orlando Artiga Corado." CORADO legally changed her name sometime between 2003 and 2004.

18. Casa Ruby claimed to provide the following services within the District: (a) to provide housing services for homeless LGBTQ+ youth including transitional housing; (b) to assist LGBTQ+ immigrants and connect them to attorneys; (c) to provide social services such as case management and therapeutic mental health support for survivors of violence, and (d) to assist with a wide array of services such as assisting with passport applications and U-Visas. The U nonimmigrant status ("U Visa") is set aside for victims of certain crimes who have suffered mental or physical abuse and are helpful to law enforcement and government officials in the investigation and prosecution of criminal activity. Casa Ruby's website (www.casaruby.org), which is no longer in service, stated that Casa Ruby employed over 50 people and provided more than 30,000 social and human services to more than 6,000 people each year. Casa Ruby had multiple locations in the District of Columbia.

19. Over the years that Casa Ruby operated, it received millions of dollars between donations, awards, and grants, awarded by both private donors and government agencies. Moneys received by Casa Ruby included funds awarded by the District of Columbia's Department of Human Services ("DC-DHS").

20. Despite the large amount of public funding provided to Casa Ruby to ostensibly provide services within the District, according to publicly-available reporting, Casa Ruby had effectively ceased operations as of July 2022. The last post on Casa Ruby's Facebook page (www.facebook.com/CasaRubyDC/) was made in July 2022. By this date, the transitional housing had shuttered, employees had reportedly gone unpaid, and Casa Ruby had been evicted from multiple properties for failure to pay rent.

21.     According to filings with District government, CORADO was also the beneficial owner of TIGloballogistics LLC ("TIGlobal").  On February 13, 2019, CORADO registered TIGlobal with the Department of Licensing and Consumer Protection.  CORADO was the only member of TIGlobal and, consequently, was required to report the gains and losses from TIGlobal to the IRS on Schedule C of her Form 1040 tax return.  On her tax return for 2019, CORADO described TIGlobal's principal business or profession as "Service/Consulting."  On January 23, 2021, CORADO registered "Casa Ruby Pharmacy" as a trade name for TIGlobal; that trade name expired on September 1, 2023.

*PPP Loans to Casa Ruby*

22.     During 2020 and 2021, CORADO obtained two separate PPP loans guaranteed by the U.S. government.  As discussed further below, CORADO fraudulently transferred at least $100,000 of the second loan to an account CORADO controlled in the name of TIGlobal. CORADO then transferred those PPP loan funds to her bank account(s) in El Salvador. She also obtained forgiveness of the second loan by fraudulently representing that she had used all the proceeds of that loan for Casa Ruby's expenses when, in fact, she transferred at least $100,000 of those funds to her own personal, foreign bank account.

23.     On April 8, 2020, CORADO applied for a PPP loan on behalf of Casa Ruby.  In that application, CORADO stated that Casa Ruby had 86 employees with an average monthly payroll of $131,688.  CORADO's application requested a loan in the amount of $329,200. CORADO stated on the application that she was the 100 percent owner of Casa Ruby and that the purpose of the loan was to pay the following expenses: "payroll," "lease/mortgage interest," "utilities," and "healthcare."  Question 7 on the PPP loan application asked "[i]s the United States the principal place of residence for all employees of the Applicant included in the Applicant's

8

payroll calculation above?" In response to Question 7, CORADO stated "Yes." CORADO also certified on the loan application that "I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud." CORADO electronically signed the loan application with a digital signature.

24. On April 15, 2020, on behalf of CORADO and Casa Ruby, Manufacturers Traders & Trust Company ("M&T Bank") submitted a loan guaranty request to the SBA for a PPP loan in the amount of $329,200. M&T Bank is a financial institution with deposits insured by the Federal Deposit Insurance Corporation. In its request, M&T Bank stated that "[t]he Applicant has certified that the principal place of residence for all employees included in the Applicant's payroll calculation is the United States."

25. On April 23, 2020, M&T Bank disbursed a PPP loan in the amount of $329,200 to Casa Ruby by depositing that amount into Casa Ruby's M&T Bank Account x4601 (the "Casa Ruby M&T Account").

26. On February 17, 2021, CORADO applied for a Second Draw PPP Loan with the SBA. On that application, CORADO stated that Casa Ruby had 58 employees with an average monthly payroll of $182,486. CORADO's Second Draw application requested a loan in the amount of $456,215. CORADO further stated that the purpose of the loan was to pay the following expenses: "Payroll Costs," "Rent/Mortgage Interest," and "Utilities." Question 6 on the Second Draw application asked, "Is the United States the principal place of residence for all employees included in the Applicant's payroll calculation above?" In response, CORADO stated "Yes." CORADO certified on the Second Draw application that "[a]ll loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rules[.]" CORADO also certified as follows:

9

> I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud. …
>
> I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. [§§]1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. [§] 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. [§] 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

27. On April 2, 2021, after receiving a guarantee from the SBA, M&T Bank disbursed a Second Draw PPP loan in the in amount of $456,215 to Casa Ruby by depositing that amount into the Casa Ruby M&T Account. Prior to that deposit, the daily balance for the Casa Ruby M&T Account was $8,622; the resulting balance after that deposit was $464,837.

28. During this investigation, I have reviewed records for the Casa Ruby M&T Bank Account. CORADO was the registered owner of the Casa Ruby M&T Account. CORADO filled out the Commercial Deposit Account Opening request and signed it on May 17, 2019. CORADO opened the account at the M&T Bank branch located at 1680 K Street NW, Washington, D.C. One other person, W-1, also had signature authority for the account. However, during this investigation, law enforcement interviewed W-1, who stated that W-1 did not have a credit/debit card or a checkbook for any Casa Ruby account. W-1 also stated that s/he did not have access to this account and could not see what was happening in the account, and that CORADO was in charge of the financials for Casa Ruby while s/he focused on the programs at Casa Ruby. W-1 stated that s/he was only a signatory on the account so that s/he could sign payroll checks when CORADO was away or out of the country. W-1 said s/he never made fund transfers out of the account without

10

authorization from CORADO.

29. On April 5, 2021—three days after receiving Second Draw PPP loan funds—the closing balance for the Casa Ruby M&T Account was $417,017. The next day, on April 6, 2021, CORADO transferred $100,000 from the Casa Ruby M&T Account to a different M&T Bank account (x9064) held in the name of TIGlobal. During this investigation, I have reviewed records from M&T Bank for the TIGlobal Account x9064. CORADO was the only person who had signature authority for TIGlobal Account x9064 and CORADO was the only person authorized to transfer funds out of that account.

30. Based on my investigation, I believe that the $100,000 that CORADO transferred to TIGlobal Account x9064 on April 6, 2021, was an unauthorized expenditure of PPP loan funds. On the application for the Second Draw PPP loan, CORADO stated that the funds would only be used for payroll, mortgage/rent expenses, and utilities. TIGlobal was not a "payroll" cost for Casa Ruby; it was not a landlord or mortgage servicer for Casa Ruby; and it was not a utility provider. Nor do the records for TIGlobal Account x9064 show that money was disbursed from that account to pay for any of these types of expenditures. Consequently, CORADO falsely certified on the Second Draw application that the loan would only be used for those stated purposes. As noted above, TIGlobal was a separate business owned entirely by CORADO with a stated purpose of "Services/Consulting."

31. After CORADO deposited $100,000 into the TIGlobal Account on April 6, 2021, the resulting balance in TIGlobal Account x9064 was $139,986. Eight days later, on April 14, 2021, CORADO withdrew $39,986 from the account leaving the account with a balance of exactly $100,000. The next day, April 15, 2021, CORADO transferred $100,000 from TIGlobal Account x9064 to an offshore bank account in El Salvador held in the name of "Vladimir Orlando Artiga

11

Corado," which was CORADO's given name at birth. Based on my investigation, this $100,000 transfer to CORADO's personal offshore account was not for payroll, rent, or other approved expenditures for a Second Draw PPP loan. CORADO's transfer of $100,000 from TIGlobal Account x9064 on April 15, 2021, left the account with a zero dollar balance.

32. On September 16, 2021, CORADO submitted an application for forgiveness for the full amount of the Second Draw PPP loan, which was $456,512. On that application, CORADO claimed that the entire amount of the loan that Casa Ruby received had been spent on payroll costs for Casa Ruby. Based on my investigation, in fact, as described above, no less than $100,000 of that loan was transferred to TIGlobal Account x9064 controlled by CORADO and then transferred to CORADO's personal offshore account in El Salvador. There is no evidence that money was ever used to pay any of Casa Ruby's payroll costs.

33. On January 18, 2023, investigators confirmed that the Second Draw PPP loan had been forgiven and cancelled by M&T Bank.

*EIDL Loans to Casa Ruby*

34. During 2020, CORADO obtained an EIDL Loan on behalf of Casa Ruby in the amount of $150,000. And during 2021, CORADO secured an additional $350,000 in EIDL funds. As discussed further below, I have learned during my investigation that CORADO violated the terms of the EIDL loan agreement by transferring $100,000 of Casa Ruby's EIDL funds to another account in the name of TIGlobal that CORADO controlled. CORADO then transferred $50,000 of those EIDL funds to her offshore account(s).

35. On March 31, 2020, CORADO applied to the SBA for an EIDL loan on behalf of Casa Ruby in the amount of $150,000. On July 19, 2020, CORADO executed an EIDL loan agreement with the SBA in the amount of $150,000, which was to be repaid over thirty years. In

12

the loan agreement, CORADO agreed to the following conditions, among others:

> Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020, and continuing thereafter[.] …
>
> Borrower will not use, directly or indirectly, any portion of the proceeds of this Loan to relocate without the prior written permission of SBA. The law prohibits the use of any portion of the proceeds of this Loan for voluntary relocation from the business are in which the disaster occurred. …
>
> Borrower will not, without the prior written consent of SBA, make any distribution of Borrower's assets or give any preferential treatment, make any advance, directly or indirectly, by way of loan, gift, bonus, or otherwise, to any owner or partner or any of its employees, or to any company directly or indirectly controlling or affiliated with or controlled by Borrower, or any other company. …

36. In approximately July 2021, CORADO applied to the SBA for a modification of Casa Ruby's EIDL loan. CORADO requested that the amount of the loan be increased by an additional $350,000 for a total loan amount of $500,000. On August 4, 2021, CORADO signed an amended EIDL loan agreement on behalf of Casa Ruby. The amended loan agreement was for a total amount of $500,000 and CORADO agreed to repay the loan within thirty years of the date of the initial EIDL loan. In the amended loan agreement, CORADO agreed to the following conditions, among others:

> Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020, and continuing thereafter[.] …
>
> Borrower will not use, directly or indirectly, any portion of the proceeds of this Loan to relocate without the prior written permission of SBA. The law prohibits the use of any portion of the proceeds of this Loan for voluntary relocation from the business are in which the disaster occurred. …
>
> Borrower will not, without the prior written consent of SBA, make any distribution of Borrower's assets or give any preferential treatment, make any advance, directly or indirectly, by way of loan,

>gift, bonus, or otherwise, to any owner or partner or any of its employees, or to any company directly or indirectly controlling or affiliated with or controlled by Borrower, or any other company. …

37. On August 10, 2021, the U.S. Treasury deposited $350,000 via wire transfer using the interstate wires into the Casa Ruby M&T Account that CORADO had opened in Washington, D.C. The same day, August 10, 2021, CORADO deposited check numbers 10626 and 10418 drawn on the Casa Ruby M&T Account each in the amount of $50,000 into another account at M&T Bank (x0394) in the name of TIGlobal. Figure 1 and Figure 2 are images of the front and back of those two checks.



*Figure 1*

14



*Figure 2*

38.     CORADO signed both of those checks on behalf of Casa Ruby. CORADO opened TIGlobal Account x0394 in February 2019 and was the only signatory on the account at the time that the checks were deposited.[1] CORADO also endorsed the back side of those checks on behalf of TIGlobal before the checks were deposited into TIGlobal Account x0394.

39.     As noted above, TIGlobal was a separate business owned entirely by CORADO with a stated purpose of "Services/Consulting." There is probable cause to believe that these two checks totaling $100,000 were not for permissible purposes under the terms of Casa Ruby's EIDL loan. By the terms of the loan agreement and the amended loan agreement, CORADO could use

---

[1] On August 13, 2021, CORADO's husband, W-2, was added to the account paperwork for TIGlobal Account x0394.

15

EIDL funds only as "working capital to alleviate economic injury." Moreover, the terms of the EIDL loan prohibited CORADO from transferring EIDL funds "to any company directly or indirectly controlling or affiliated with or controlled by Borrower" without the consent of the SBA. Upon information and belief, the SBA never authorized those transfers to TIGlobal. Therefore, there is probable cause to believe that CORADO engaged in a scheme or artifice to defraud and to obtain money and property from the U.S. Treasury.

40. On August 10, 2021, after CORADO deposited checks 10626 and 10418, the resulting balance of funds in TIGlobal Account x0394 was $107,193. Two days later, on August 12, 2021, the balance of funds in that account was $98,396.

41. On August 13, 2021, CORADO transferred by wire $50,000 from TIGlobal Account x9604 to an offshore account held in the name of "Vladimir Orlando Artiga Corado" which was CORADO's given name at birth. There is probable cause to believe that this $50,000 transfer violated the terms of Casa Ruby's EIDL loan. This transfer to an offshore account was to an account in CORADO's personal name. Consequently, the funds could not be used as "working capital" for Casa Ruby once they were moved out of the United States. Moreover, the terms of the EIDL loan prohibited preferential transfers in favor of Casa Ruby's owners. And, upon information and belief, the SBA never authorized those transfers to CORADO's offshore account(s).

*Other Offshore Bank Transactions*

42. As described above, CORADO transferred $100,000 of Second Draw PPP loan funds and $50,000 of EIDL loan funds to her offshore account(s). During this investigation, law enforcement has also identified six other transfers from U.S. bank accounts controlled by CORADO to her offshore bank account(s) El Salvador:

16

| DATE | TRANSFER TYPE | U.S. ACCOUNT | NAME ON OFFSHORE ACCOUNT | AMMOUNT |
|---|---|---|---|---|
| 4/7/2021 | Wire | TIGlobal M&T Bank Account x0394 | Vladimir Orlando Artiga Corado | $4,999 |
| 6/24/2021 | Wire | TIGlobal M&T Bank Account x0394 | Vladimir Orlando Artiga Corado | $50,000 |
| 7/23/2021 | Wire | TIGlobal M&T Bank Account x0394 | Vladimir Orlando Artiga Corado | $25,000 |
| 8/18/2021 | Wire | TIGlobal M&T Bank Account x0394 | Vladimir Orlando Artiga Corado | $30,000 |
| 8/31/2021 | Wire | TIGlobal M&T Bank Account x0394 | Vladimir Orlando Artiga Corado | $30,000 |
| 9/21/2021 | Wire | TIGlobal M&T Bank Account x0394 | Vladimir Orlando Artiga Corado | $10,000 |

During calendar year 2021, these eight transfers to CORADO's offshore bank account(s) have an aggregate total of $299,999.  Consequently, there is probable cause to believe that CORADO was required to file an FBAR for CORADO's account(s) in El Salvador by virtue of have at least one foreign bank account with a balance greater than $10,000 during 2021.  After a diligent search, I believe that CORADO has never filed an FBAR for any foreign bank account.

43.     During this investigation, I have reviewed CORADO's prepared individual income tax returns (Form 1040s) for the years 2017, 2018, 2019, 2020, and 2021.  Based on my training and experience, I know that the IRS tells all taxpayers that they must report whether they hold a financial interest in, or signature authority over, a financial account in a foreign country.  The IRS instructions for individual returns expressly state that if the taxpayer has a financial interest in such an account, then the taxpayer must prepare and file Schedule B (Form 1040) to report the account

to the IRS.[2]  Consequently, CORADO knows that she is required to report an interest in a foreign bank account to the IRS.  Yet none of CORADO's prepared returns include Schedule B (Form 1040) and CORADO has never filed an FBAR—notwithstanding the fact that CORADO wired almost $300,000 to her bank account(s) in El Salvador during 2021.

## CONCLUSION

44.     CORADO defrauded M&T Bank by using PPP loan funds for impermissible purposes.  CORADO then falsely told the SBA that the funds from Casa Ruby's Second Draw PPP loan were used solely for payroll expenses when, in fact, CORADO had transferred a significant portion of those funds to her personal offshore account in El Salvador.  This fraud resulted in M&T Bank granting loan forgiveness to CORADO and Casa Ruby.  There is, therefore, probable cause to believe that CORADO violated the federal bank fraud statute, 18 U.S.C. § 1344.

45.     CORADO also fraudulently used EIDL funds received from the U.S. Treasury for purposes not authorized by the EIDL program.  Those EIDL funds had been transferred by wire into a bank account that CORADO opened for Casa Ruby in Washington, D.C., from the U.S. Treasury's Federal Disbursement Service outside of Washington, D.C.  In furtherance of the

---

[2] The IRS instructions for Form 1040 state that "You must complete Part III of Schedule B if you [h]ad a foreign account."  *See* Instructions for 1040 (and 1040-SR) at 23, *available at* https://www.irs.gov/pub/irs-pdf/i1040gi.pdf (accessed February 29, 2024).  The IRS instructions for Schedule B (Form 1040) state the following regarding Part III of that schedule:

> Line 7a—Question 1. Check the 'Yes' box if at any time during 2023 you had a financial interest in or signature authority over a financial account located in a foreign country. … A financial account is located in a foreign country if the account is physically located outside of the United States. …

> Line 7A—Questions 2.  See FinCEN Form 114 and its instructions at FINCEN.gov to determine whether you must file the form.  Check the "Yes" box if you are required to file the form. … If you checked the "Yes" box to Question 2 on line 7a, you must electronically file FinCEN Form 114 with the Treasury's Financial Crimes Enforcement Network.

Instructions for Schedule B  at B-2, B-3, *available at* https://www.irs.gov/pub/irspdf/i1040sb.pdf (accessed February 29, 2024).

scheme, CORADO then transferred $50,000 of these proceeds into her own personal, foreign bank account. CORADO also worked in Washington, D.C., at the time of these wire transfers. This conduct violated the wire fraud statute, 18 U.S.C. § 1343.

46.  As discussed above, CORADO engaged in multiple financial transactions with the proceeds of her bank fraud and wire fraud in amounts over $10,000 per transaction. There is, therefore, probable cause to believe that CORADO has violated 18 U.S.C. § 1957 (Transactions in Criminally-Derived Proceeds). And CORADO violated the federal money laundering statute when she moved those funds obtained by fraud out of the United States to CORADO's offshore bank account(s) in order to conceal the proceeds of her scheme. *Cf.* 18 U.S.C. § 1956(a)(2)(B)(i).

47.  Finally, CORADO has willfully failed to comply with the requirement that CORADO report her foreign bank account(s) to the IRS in violation of 31 U.S.C. §§ 5314 and 5322(b).

Respectfully submitted,

_____
Special Agent Paulina Murphy
Federal Bureau of Investigation

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by
telephone on March 1, 2024.

_____
HONORABLE ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE