UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RUBY CORADO<br>(a/k/a "Ruby Jade Corado" and<br>"Vladamir Orlando Artiga Corado"),<br><br>Defendant. | No. 24-mj-81 |

## UNITED STATES' MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

Defendant Ruby Corado poses a unique and serious flight risk. She received more than $1.3 million in taxpayer-backed emergency relief funds that were intended to support the defendant's non-profit organization, Casa Ruby, Inc. Instead of using those funds as she promised, the defendant stole at least $150,000 of those funds by transferring them to offshore bank accounts which she hid from the IRS. During 2022, when financial irregularities at Casa Ruby became public, the defendant sold her home in the United States and fled to El Salvador. Law enforcement arrested the defendant after she quietly and unexpectedly returned to the United States last week. The Court should order that the defendant be detained pursuant to 18 U.S.C. § 3142(f)(2)(A) pending further proceedings in this matter.

### BACKGROUND

The defendant founded Casa Ruby, Inc., ("Casa Ruby") a District of Columbia ("District") nonprofit that provided transitional housing and related support to youth who identified as lesbian,

gay, bisexual, transgender, queer, and other sexual identities and orientations ("LGBTQ+"). (Aff.[1] ¶ 17.) Casa Ruby received millions of dollars in donations, awards, and grants—awarded by both private donors and government agencies—including the District's Department of Human Services ("DC-DHS"). (Aff. ¶ 19.) Casa Ruby folded in July 2022 and its affairs are managed by a court-appointed receivership.

The Affidavit in support of the Criminal Complaint describes no less than $1.3 million in taxpayer-backed funds that the defendant received during the COVID-19 global health crises. (Aff. ¶¶ 25, 27, 35, 37). But rather than use those funds to support Casa Ruby's mission as the defendant promised, the defendant further contributed to its demise by unlawfully transferring $150,000 of these federal emergency relief funds into her own private offshore bank account. Then when media reports suggested the defendant would be prosecuted for squandering Casa Ruby's government funding, she sold her home and fled the country.

*PPP Loan Fraud*

In 2020 and 2021, the defendant obtained two separate loans totaling nearly $800,000, from the federal government's Paycheck Protection Program ("PPP"). (Aff. ¶ 19.) The defendant fraudulently obtained these loans—and got the second loan forgiven—by representing that she would use the funds exclusively for Casa Ruby's business expenses when, in fact, she transferred at least $150,000 of the loan proceeds to her own personal foreign bank account. (Aff. ¶¶ 22-33.)

The defendant received $329,200 on behalf of Casa Ruby from the first PPP loan disbursement on April 23, 2020. (Aff. ¶ 25.) To receive the first PPP loan, the defendant certified, *inter alia*, that the United States was "the principal place of residence for all employees" of Casa

---

[1] "Aff. ¶ _" refers to the affidavit in support of a criminal complaint in this matter at the stated paragraph.

2

Ruby, and that the purpose of the loan was to pay Casa Ruby expenses, such as payroll, lease/mortgage interest, utilities, and healthcare. (Aff. ¶ 23.)

Nearly one year later, on April 2, 2021, the defendant applied for and received another $456,215 on behalf of Casa Ruby from the second PPP loan disbursement. (Aff. ¶ 27.) Again, to receive the second PPP loan, the defendant fraudulently certified, *inter alia*, that the United States was "the principal place of residence for all employees" of Casa Ruby, and that the purpose of the loan was to pay business-related expenses, such as payroll costs, rent/mortgage interest, and utilities. (Aff. ¶ 26.) Despite this promise, four days later—on April 6, 2021—the defendant transferred at least $100,000 of the second PPP loan disbursement to an account that only the defendant controlled in the name of TIGlobal in violation of PPP loan rules and the certifications she had submitted. (Aff. ¶¶ 29, 30.) On April 15, 2021, the defendant then transferred the same $100,000 in PPP loan funds to a personal offshore bank account in El Salvador. (Aff. ¶ 31.)

On September 16, 2021, the defendant then applied for forgiveness of the second PPP loan by fraudulently representing that she had used all of those loan proceeds—all $456,215—for Casa Ruby's expenses consistent with the terms of the loan. (Aff. ¶ 32.) In fact, she had transferred at least $100,000 of those funds to her offshore bank account. (Aff. ¶ 32.) Nonetheless, Casa Ruby received loan forgiveness for the full $465,215.

*EIDL Fraud*

In 2020 and 2021, the defendant obtained two additional separate loans from the Economic Injury Disaster Loan ("EIDL") program. In total, the defendant received $500,000 on behalf of Casa Ruby, after certifying in 2020 and 2021 that the disbursed funds would be used "solely as working capital to alleviate economic injury" from the COVID-19 pandemic, that the funds would not be used for "voluntary relocation," and the funds would not be disbursed to another company

3

directly controlled by the borrower (without the SBA's written consent).  (Aff. ¶¶ 35, 36.)  The U.S. Treasury made two deposits of EIDL funds into Casa Ruby's bank accounts: (1) a deposit of $150,000 on July 19, 2020; and (2) a deposit of $350,000 on August 10, 2021.

Despite the requirement that EIDL funds could not be disbursed to other companies owned by the borrower, on August 10, 2021 – the same day the defendant received the second EIDL loan disbursement – the defendant wrote two $50,000 checks from a Casa Ruby bank account to another account in the name of TIGlobal that only the defendant controlled.  Figure 1 and Figure 2 are images of the front and back of those two checks.  (Aff. ¶ 37.)



Figure 1

4



*Figure 2*

The defendant signed these two checks on behalf of Casa Ruby as the payor *and* endorsed the back of each check as payee when she deposited it into TIGlobal's account. (Aff. ¶¶ 37-39.) In so doing, the defendant violated the requirements of the EIDL program – in particular, the requirement that the funds only be used to alleviate economic harm stemming from the pandemic and for the "working capital" of Casa Ruby. But the defendant's fraudulent activity did not stop there. She then transferred $50,000 of the $100,000 to her own personal, foreign bank account in El Salvador, again in contravention of the EIDL program's requirements. (Aff. ¶ 41.)

*Offshore Banking and Assets*

In addition to the $150,000 in federal loan funds intended for Casa Ruby, the defendant

transferred another $149,999 – for a total of $299,999 – during 2021 to her own personal bank accounts in El Salvador.  (Aff. ¶ 42.)  The defendant failed to comply with federal law requiring any individual holding a foreign bank account with a balance greater than $10,000 to file a Report of Foreign Bank and Financial Accounts ("FBAR") with her tax returns.  Specifically, there is no record of the defendant filing an FBAR for any foreign bank account for any tax year, including 2021.  The defendant also attempted to conceal the proceeds of her scheme to steal federal money intended for Casa Ruby by moving those funds to offshore bank accounts, thereby violating the federal money laundering law.

*Flight from the United States*

Casa Ruby effectively ceased operations as of July 2022 – shuttering its transitional housing, failing to pay its employees, and facing eviction from multiple properties for failure to pay rent.  (Aff. ¶ 20.)  During July 2022, multiple media outlets reported complaints from landlords, vendors, and companies that Casa Ruby had not paid its debts.[2]  The media also reported that the defendant sold her home in Prince George's County in January 2022; that multiple Casa Ruby employees stated they had not heard from the defendant since May 2022; and that social media indicated that the defendant was residing in El Salvador.[3]

Also during July 2022, the D.C. Office of the Attorney General filed a civil complaint, alleging that the defendant's financial mismanagement of Casa Ruby had violated the District's Nonprofit Corporation Act, D.C. Code §§ 29-401.01.  *See* Complaint, *District of Columbia v.*

---

[2] *See, e.g.*, Case Parks, *Casa Ruby Shuts Down the Rest of Its Operations, and Workers Go Unpaid*, The Washington Post (July 17, 2022), available at https://www.washingtonpost.com/dc-md-va/2022/07/17/casa-ruby-programs-close/ (last visited March 5, 2024); Dawn Ennis, *LGBTQ+ Shelter Mystery: Where's Ruby Corado?  Where's the Money?*, Forbes (July 17, 2022), available at https://www.forbes.com/sites/dawnstaceyennis/2022/07/17/lgbtq-shelter-mystery-wheres-ruby-corado-wheres-the-money/?sh=28a27cbb1f60 (last visited March 5, 2024).

[3] *See* Parks *supra.*

6

*Casa Ruby, Inc.*, et al., No. 2022 CA 003343 B (filed July 29, 2022) ("OAG Case"). The D.C. Superior Court placed the nonprofit organization under receivership. OAG Case, 8/12/22 Order.

During the course of these events in 2022, the defendant left the United States for El Salvador. According to information available to law enforcement, the defendant did not return to the United States until just last week.

*Arrest*

On February 25, 2024, the defendant returned to the United States from El Salvador. Law enforcement promptly sought the instant arrest warrant for the defendant, which this Court issued on March 1, 2024. The Affidavit in support of the criminal complaint describes the defendant's scheme to defraud the PPP and EIDL programs; her movement of criminal proceeds to offshore bank accounts; and her failure to file reports for offshore accounts required by law. The Complaint charges the defendant with violations of 18 U.S.C. §§ 1344 (Bank Fraud), 1343 (Wire Fraud), 1956 (Laundering of Monetary Instruments), and 1957 (Monetary Transactions in Criminally-Derived Proceeds); and 31 U.S.C. §§ 5314 and 5322(b) (Failure to File Report of Foreign Bank Account).

On March 5, 2024, the defendant was arrested on that warrant at a hotel located in Laurel, Maryland. The defendant was alone at the hotel. At the time of arrest, the defendant was in possession of a passport issued by the Republic of El Salvador which had been issued on February 23, 2024.

**APPLICABLE LEGAL PRINCIPLES**

A defendant must be detained pending trial if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e)(1). The Bail Reform Act

7

("BRA") requires the judicial officer to assess various factors, including: "(1) the nature and circumstances of the offense charged . . . ; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

**ARGUMENT**

The statutory factors in 18 U.S.C. § 3142(g) weigh in favor of the pretrial detention of the defendant.  The crimes charged in the Complaint are serious, the evidence against the defendant is compelling, and the defendant's flight from the United States when facing possible negative legal consequences shows she cannot be relied upon to appear before the Court for future proceedings.

**I.      The Nature and Circumstances of the Offense Charged**

Without question, the offenses described in the Complaint are serious and carry substantial penalties.  The amount of federal money stolen by the defendant – at least $150,000– and deposited into her personal bank accounts in El Salvador is both substantial and troubling, particularly given that these funds were intended for the benefit of District youth in need of housing and other services.  These funds were part of $1.3 million in federal emergency relief loans intended to help Casa Ruby survive the COVID pandemic.

The defendant faces serious consequences for these offenses.  Bank fraud carries a maximum sentence of 30 years of incarceration.  Wire fraud carries an additional penalty of up to twenty years of incarceration.  The money laundering charges in violation of 18 U.S.C. §§ 1956 and 1957 carry maximum penalties of twenty years and ten years of imprisonment, respectively.  And the charge of failing to file report of foreign bank account is punishable by up to five years of

incarceration. These offenses also each carry a fine—for bank fraud up to $1 million.[4] These substantial penalties weigh in favor of detention.

## II. The Weight of the Evidence

The government's evidence against the defendant, as summarized above and described at length in the Affidavit in support of criminal complaint, is compelling. There is little doubt that the defendant obtained forgiveness for the second PPP loan by representing that the entirety of that loan had been spent on Casa Ruby's expenses, when in fact she knew she had transferred at least $100,000 (over 20%) of the loan proceeds to a private offshore bank account. Nor is there much room to question that the defendant obtained $500,000 in EIDL loans similarly intended to help Casa Ruby weather the pandemic, but sent at least $50,000 of these loan process to her foreign bank account. And there can be no question that the defendant hid her private offshore banking from the IRS by failing to identify all foreign bank accounts on Schedule B of her individual income tax return and failing to file a Report of Foreign Bank and Financial Account ("FBAR") with the Department of the Treasury.[5]

This evidence strongly supports all of the crimes identified in the Complaint. Accordingly, this factor also weighs heavily in favor of detention.

## III. The History and Characteristics of the Defendant

The third factor in section 3142(g) considers, among others, a detainee's "character,

---

[4] While it is premature to estimate the applicable U.S. Sentencing Guidelines range, if the defendant were to be convicted at trial of the fraud offenses described herein, involving hundreds of thousands of dollars of loss to the federal emergency loan programs, the laundering of the proceeds of this fraud, and the failure to disclose foreign bank accounts, she would likely face multiple years of incarceration under the Guidelines.

[5] The Affidavit in support of the Criminal Complaint identifies six other transfers of funds to foreign bank accounts. (Aff. ¶ 42.) Although law enforcement continues to investigate these transactions, each of those transfers—which total another $149,999—may contain proceeds of the defendant's bank fraud and wire fraud crimes. As such, those six transactions may constitute further violations of the money laundering statutes.

physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, [and] criminal history[.]" 18 U.S.C. § 3142(g)(3). Although the defendant was once a leading charitable figure in our community, she betrayed the trust of the donors who supported her, the District, and federal government that funded her, and the very community she claimed to serve. This speaks volumes about her character. When coupled with the fact that the defendant abandoned her career, sold her home, and fled the country after learning she might be prosecuted for this financial misconduct, there are simply no conditions or combination of conditions that can assure the defendant's return to court.

The defendant was the founder and namesake of Casa Ruby. A transgender immigrant from El Salvador who overcame great adversity, she understood better than anyone the need for services for LGBTQ+ youth in the District. Upon the promise of serving this community, the defendant raised millions of dollars in private and government contributions. Rather than use the opportunity of the immense emergency relief funding offered during the pandemic as a second chance for Casa Ruby. The defendant took advantage of the situation to formulate an exit strategy. She absconded to El Salvador with at least $150,000 of those loan proceeds.

The defendant's decision in 2022 to sell her Maryland home and move from the United States to El Salvador—following public reporting that the D.C. Office Attorney General had decided to prosecute the defendant for financial mismanagement of Casa Ruby—also weighs heavily in favor of her detention. The defendant certainly was aware of the allegations against her and the possibility of criminal charges that could be brought against her. Indeed, the defendant's transfer of nearly $300,000 to her personal bank accounts in El Salvador during 2021 suggests that she had been preparing for months to leave the country and intended to erase her footprint from the United States.

10

Today, the defendant owns no property—not even a vehicle—in the United States. The defendant has no employment or other source of income. The defendant maintains citizenship in El Salvador and she was arrested with a newly-issued El Salvador passport.[6] She has bank accounts with unknown balances in El Salvador which she has failed to disclose to the U.S. government. And her spouse lives and works in El Salvador. The Court simply cannot be confident that the defendant will not flee the country again should the Court release her pending trial.

## IV. The Danger to Any Person and the Community

Concededly, this case does not involve a crime of violence. However, the defendant's cold and calculating willingness to fraudulently obtain emergency relief funding intended for businesses struggling through the pandemic, and to steal at least $150,000 of that money for her own benefit, rather than use that money to try to help save her failing charity, make her a risk of reoffending. The seriousness of the crimes at issue, the strength of the government's evidence, her personal characteristics, and her prior flight from the United States counsel in favor of her detention.

---

[6] The United States and El Salvador have an extradition treaty that entered into force in 1911. *See* Treaty of Extradition Between the United States of American and El Salvador, U.S.-El Sal., Apr. 18, 1911, 37 Stat. 1516. Like many older U.S. extradition treaties, the list of extraditable offenses does not contain modern crimes like money laundering and the failure to file a foreign bank account registration form.

## CONCLUSION

For the foregoing reasons, the government respectfully submits that the Court should order that the defendant be detained pending trial in this matter because there are no conditions or combination of conditions that could prevent her flight.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By: _____
JOHN W. BORCHERT (Bar No. 472824)
MADHU CHUGH (Bar No. 992122)
Assistant United States Attorney
Fraud, Public Corruption & Civil Rights Section
601 D Street, NW
Washington, D.C.  20530
JWB: (202) 252-7679; john.borchert@usdoj.gov
MC: (202) 815-8609; madhu.chugh@usdoj.gov

March 7, 2024